Sophia M. Rios (SBN 305801)
BERGER MONTAGUE PC
401 B Street, Suite 2000
San Diego, CA 92101
Tel: (619) 489-0300
srios@bm.net

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| ZACHARY WALKINE,<br><br>Plaintiff,<br><br>v.<br><br>VICTORIA MUTUAL BUILDING SOCIETY, VICTORIA MUTUAL INVESTMENTS LIMITED, VICTORIA MUTUAL GROUP, VICTORIA MUTUAL WEALTH MANAGEMENT LIMITED, REZWORTH BURCHENSON, CONROY ROSE, DENISE MARSHALL-MILLER, KERI-GAYE BROWN, DEVON BARRETT, and COURTNEY CAMPBELL,<br><br>Defendants. | Civil Action No. 5:22-cv-01608<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

**INTRODUCTION**

Plaintiff Zachary Walkine ("Plaintiff") alleges as follows against Defendants Victoria Mutual Building Society ("VM Building Society"), Victoria Mutual Investments Limited ("VM Investments"), Victoria Mutual Group ("VM Group"), Victoria Mutual Wealth Management Limited ("VM Wealth") (collectively with VM Building Society, VM Investments, and VM Group, "Victoria Mutual"), Rezworth Burchenson, Conroy Rose, Denise Marshall-Miller, Keri-Gaye Brown, Devon Barrett, and Courtney Campbell (the "Individual Defendants"), based on personal knowledge as to Plaintiff and his own acts, and otherwise on information and belief, based on the investigations of his counsel. Upon information and belief, Plaintiff believes that discovery will further support the allegations in this Complaint.

**FACTUAL SUMMARY**

1.     Plaintiff is a client of Victoria Mutual in its wealth management business, VM Investments and VM Wealth, and jointly with his mother, Eleanor Fung Chung-Walkine ("Chung-Walkine"; collectively with Plaintiff, "the Walkines"), has maintained investment accounts with Victoria Mutual (the "Accounts" or the "VM Wealth Accounts") for more than a decade.

2.     In or around 2011, the Walkines began doing business with Victoria Mutual, a Jamaica-based financial institution with which the Walkines opened an investment account and funded it with at least $1 million between December 2011 and September 2013.  The Walkines' portfolio initially began as a mix of local (Jamaican) and global bonds, as well as Victoria Mutual's unit trusts, which invested in equities and bonds like mutual funds.  Beginning in or around 2015, the Walkines' Accounts also included U.S. equities.

3.     Although a formal agreement was never executed, the parties behaved at all times as though there was a contractual relationship between them for the provision of investment services, with Victoria Mutual as the investment adviser,

securities broker-dealer, and wealth manager, and the Walkines as the client. Likewise, Defendants held themselves out as fiduciaries and, having provided research and investment advice, and having executed the purchase and sale of securities, Defendants undertook fiduciary obligations to the Walkines.

4.     Throughout the relationship, unbeknownst to Plaintiff, Defendants grossly mismanaged the Accounts. In breach of their fiduciary duties and in breach of any contractual relationship existing between the parties, Defendants perpetrated a host of failures upon the sizable sums that the Walkines reasonably entrusted to Victoria Mutual, including, among numerous other things, misplacing deposits, failing to execute trades that were validly ordered, conducting unauthorized trades, uniformly failing to provide periodic statements, failing to properly maintain the Walkines' assets, and failing to communicate material investment information reasonably impacting the Walkines' investment decisions, all to the economic detriment of Plaintiff.  Moreover, Defendants leveraged their position as fiduciary to discourage – and in certain cases, to prevent – the Walkines from terminating the relationship.

5.     Defendants' wrongful conduct went concealed from Plaintiff (and Chung-Walkine) for years, only surfacing in the context of specific transactions occurring in recent years.  Importantly, in many of these instances, Defendants readily admit these failures. At various points during the relationship, Defendants have acknowledged "dropp[ing] the ball" and "not [being] able to locate" deposited funds. The correspondence between the parties is indeed littered with Victoria Mutual's expressions of apology, mea culpa, and in many cases, outright confusion.

6.     For instance, in or around 2015, Defendants advised the Walkines to invest in bonds issued by Venezuelan oil company, Petroleos de Venezuela, S.A. ("PDVSA"). Amid the political and economic upheaval in Venezuela in 2017, Plaintiff inquired with Victoria Mutual about the impact on his investment and was assured on November 27, 2017 that the "[b]ond is not in default." PDVSA missed

a payment only days later, on December 1, 2017, and the bonds were in default as of January 1, 2018.  Defendants, however, did not notify Plaintiff of that fact until nearly a year later, on November 6, 2018, by which point Plaintiff's losses in the investment had increased dramatically.

7.     Likewise, in September 2018, Plaintiff instructed Victoria Mutual to purchase shares of cannabis producer Tilray, Inc. ("Tilray"), a growth stock at the time.  Victoria Mutual not only failed to execute the transaction, but attempted to blame Plaintiff for the timing of his request, wrongly asserting that the purchase order had been placed after-market hours. Eventually, the trader at Victoria Mutual acknowledged fault, communicating to Plaintiff that "I dropped the ball on your transaction." This was a costly mistake, as within a week, Tilray shares were trading at three times the price at which they traded when Plaintiff placed the order.

8.     In addition to failing to execute authorized orders, Defendants also made unauthorized trades. For example, in May 2019, Victoria Mutual inexplicably sold off a significant portion of the Walkines' investment in Energy Trading Partners ("Energy Trading"), a transaction that cost Plaintiff investment gains and dividends.  Not only was this sale not authorized by Plaintiff, but due to Victoria Mutual's consistently erratic and slapdash record-keeping, the transaction was not reflected on any deal tickets.

9.     Victoria Mutual's record-keeping was so poor that not only did it rarely provide Plaintiff with statements, but it lost track of deposited monies altogether. In one instance, Victoria Mutual acknowledged receipt of two checks totaling in excess of $500,000, but then failing to "locate" those funds such that they did not appear in Plaintiff's Accounts. In fact, $203,000 of that deposit was never "locate[d]."

10.     In another stark example of Defendants' ineptitude, if not recklessness, with respect to the execution of trades and the maintenance of records, once the Covid-19 pandemic hit in 2020, Plaintiff requested that Defendants

liquidate its position in Energy Trading to avoid losses resulting from the severe market downturn. Not only did Defendants fail to execute the sale as ordered – they did not sell all of Plaintiff's Energy Trading shares – but they tried to conceal the error by producing a phony confirmation for the transaction.  Not only was this "confirmation" apparently prepared by Interactive Brokers, a securities broker entirely unconnected to the transaction, but the document referenced the purchase of shares, whereas Plaintiff had plainly ordered a sale.

11.    All of these failures, harmful on an individual basis, were, in fact, indicative of widespread ineptitude and dereliction of duty on the part of Defendants, which ultimately proved ruinous to the Walkines' investments.  For years, neither Plaintiff nor Chung-Walkine was, or could have been, aware of the state of their investments because Defendants so rarely provided Plaintiff with statements, much less accurate statements.  In fact, on several occasions, when Plaintiff pointed out inaccuracies or discrepancies in the purported statements that Victoria Mutual did provide, Defendants habitually instructed Plaintiff to disregard such statements, with assurances that accurate ones would be forthcoming.  In other words, for most of the relationship, Plaintiff did not know – and could not have known – how badly Victoria Mutual had mismanaged the Walkines' funds.

12.    In September 2018, after Victoria Mutual failed to execute Plaintiff's purchase order for Tilray shares, Plaintiff became concerned about how the Accounts were being managed on a broader scale. He requested up-to-date statements showing all positions and balances for the Accounts. Tellingly, this request was flatly denied by VM Wealth trader Defendant Denise Marshall-Miller, and after Plaintiff insisted, went unanswered for months.

13.    It was not until March 2019 that Victoria Mutual provided the requested information. The purported "statement" that Victoria Mutual furnished revealed that not only had Defendants lost all of the Walkines' money, but somehow Plaintiff owed Victoria Mutual $564,477, which was impossible since

the Accounts did not trade on margin and Plaintiff could not have authorized trades for which the Accounts did not have the necessary funds. At that point, Victoria Mutual CEO Defendant Rezworth Burchenson requested additional time to conduct a comprehensive investigation into the Accounts, asking Plaintiff not to close his Accounts or take further action until an internal investigation was concluded. No investigation appears to have ever been conducted, as Plaintiff made numerous requests for documents related to that investigation, including any correspondence associated with such an inquiry, and no documents were ever provided. Contrary to Defendants' express representations, there is, in effect, no evidence whatsoever of Victoria Mutual having undertaken an investigation into the status of the Accounts.

14. Nine months later, Plaintiff received yet another surprise. In December 2019, in response to his demand that Victoria Mutual provide him with trade confirmations regarding certain transactions, Plaintiff received documentation showing that his trades in U.S. equities were being carried out not by Victoria Mutual, but by Morgan Stanley and Oppenheimer & Co., Inc. ("Oppenheimer"). Plaintiff learned at that time that Victoria Mutual personnel – including Defendants Conroy Rose and Denise Marshall-Miller, then-CEO of VM Pensions Management and Victoria Mutual trader, respectively – opened accounts in their names and commingled Plaintiff's Accounts with their own monies held at Morgan Stanley and Oppenheimer. None of this had been disclosed to Plaintiff at any time prior to that time. Instead, Defendants had passed off the trading desks and trading capabilities of those financial institutions – specifically with respect to U.S. equities – as their own.

15. In March 2020, Plaintiff attempted to cash out his Accounts, but Victoria Mutual continued to insist that Plaintiff owed $564,000, even though, according to Defendant Marshall-Miller, Victoria Mutual had not completed its investigation of the handling of the Walkines' Accounts.

16.     At all times, Defendants were fiduciaries of Plaintiff and Chung-Walkine, and were bound by their fiduciary duties, including without limitation the duties of care and loyalty. They held themselves out as investment advisers and/or wealth managers, and accepted deposits from the Walkines with the mutual understanding that the monies would be invested in accordance with the Walkines' express direction. By virtue of the conduct alleged herein, Defendants breached their fiduciary duties to Plaintiff.

17.     In addition, at all times, the parties were bound by an implied contract for the provision of investment and wealth management services. Although Defendants do not appear to have secured an executed written contract from either Plaintiff or Chung-Walkine, the parties behaved as though a contract was in effect and governing their relationship, the terms of which that Victoria Mutual, as a wealth manager and investment adviser, would invest Plaintiff's money as directed by Plaintiff, and would act in good faith in so doing. By virtue of the conduct alleged herein, Defendants breached this implied or express contract.

18.     This suit seeks damages and all available legal or equitable remedies to redress the economic harm suffered by Plaintiff as a direct result of Defendants' fiduciary and contractual breaches.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), and because Plaintiffs are of diverse citizenship from Defendant and the aggregate amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because among other things, Plaintiff resides in this District and thus a substantial part of the events and/or omissions giving rise to Plaintiff's claims occurred in this District.

# PARTIES

## I.   Plaintiff

21.   Plaintiff maintained investment accounts with VM Wealth and/or VM Investments (the "Accounts") and utilized investment services offered by Defendants. The Walkines originated the Accounts, but at all times relevant to this Complaint, Plaintiff had lawful control over – and in fact exercised such control over – the Accounts with Victoria Mutual. Upon Chung-Walkine's death in 2021, Plaintiff became the sole beneficial owner of the Accounts.

## II.   Defendants

22.   Defendant VM Building Society is a financial institution whose principal activities, according to its Annual Report, include granting loans, accepting deposits, trading in foreign currencies, stockbroking and securities trading, asset management, pension fund management, providing money transfer services, investing funds, investment holding and real estate services.  Founded in 1878, VM Building Society is incorporated in Jamaica under the Building Societies Act and has operations in the U.S., Jamaica, and the United Kingdom. VM Building Society's subsidiaries include VM Wealth.  On information and belief, VM Building Society and VM Group refer to the same entities and services.

23.   Defendant VM Investments is holding company and provider of select corporate finance services which, through its subsidiary VM Wealth, provides brokerage services, securities trading, asset management, corporate finance and investment advisory services. VM Investments is based in Jamaica.

24.   Defendant VM Wealth is a wholly owned subsidiary of VM Investments.  Incorporated in Jamaica, VM Wealth's principal activities include investment brokering, asset management, the provision of financial and investment advisory services, corporate finance, and money market dealing.

25.   Defendant VM Group Defendant VM Group is the conglomerate of companies associated with the Victoria Mutual Building Society and its

COMPLAINT
Case No.

subsidiaries and affiliates, such as Victoria Mutual Investments Ltd., VBMS Money Transfer Services Ltd., Victoria Mutual Finance Ltd., VMBS Overseas (UK) Ltd., Victoria Mutual Pensions Management Ltd., British Caribbean Insurance Company Ltd., VM Innovations Ltd., Victoria Mutual Foundation Ltd., Victoria Mutual Wealth Management Ltd., Victoria Mutual Investment Fund Inc., Carilend, and Victoria Mutual Property Services Ltd.  On information and belief, VM Group and VM Building Society refer to the same entities and services.

26.  Defendant Rezworth Burchenson served as Chief Executive Officer ("CEO") of VM Wealth, and at various points controlled and managed Plaintiff's VM Wealth Accounts.

27.  Defendant Conroy Rose served as CEO of VM Pensions Management and Assistant Vice President – Sales and Service, and various points controlled and managed Plaintiff's VM Wealth Accounts.

28.  Defendant Denise Marshall-Miller was a bond, equity, and digital asset trader at VM Wealth, served as Senior Manager of trading, and at various points controlled and managed Plaintiff's VM Wealth Accounts.

29.  Defendant Keri-Gaye Brown is an attorney who served as Corporate Secretary for the VM Group, and at various points controlled and managed Plaintiff's VM Wealth Accounts.

30.  Defendant Devon Barrett served as VM Group Chief Investment Officer and Head of Strategic Investments, and at various points controlled and managed Plaintiff's VM Wealth Accounts.

31.  Defendant Courtney Campbell served as President and CEO of VM Group and at various points controlled and managed Plaintiff's VM Wealth Accounts.

32.  Defendants Burchenson, Rose, Marshall-Miller, Brown, Barrett, and Campbell are referred to herein as the "Individual Defendants."

33.     As an investment advisor and fiduciary of its advisory customers such as Plaintiff, Victoria Mutual is subject to federal and state rules and regulations that mandate it to adopt policies and procedures to ensure compliance with the applicable laws and regulations.  Defendants are further obligated to disclose to its customers all material facts about any event that is material to a client or prospective client's evaluation of the integrity of the adviser and its personnel.

## FACTUAL ALLEGATIONS

### A.     The Formation of the Fiduciary and Contractual Relationship Between the Parties

34.     The Walkines became clients of Victoria Mutual in or about 2011. The relationship arose through Defendant Conroy Rose, CEO of VM Pensions Management and Assistant Vice President for Sales and Service. Defendant Rose was previously a former manager with Pan Caribbean Financial Services ("Pan Caribbean"), where the Walkines previously held accounts. When Defendant Rose left Pan Caribbean and became employed with Victoria Mutual, the Walkines moved their business to Victoria Mutual, where Defendant Rose continued to control and manage the Walkines' investments.

35.     Chung-Walkine began doing business with Victoria Mutual in or around 2011, opening an account and funding it with at least $1 million between December 2011 and September 2013, and continuing to deposit funds for investment purposes.  Up until November 2015, the Walkines' monies were invested in international bonds, local (Jamaican) bonds, money market securities, and "unit trust funds" (which invested in equities and bonds like mutual funds), as these were Victoria Mutual's investment capabilities.

36.     At no point were the Walkines' Accounts discretionary accounts. The parties behaved with the mutual understanding that all trades had to be expressly authorized by Plaintiff and/or Chung-Walkine.

COMPLAINT
Case No.

37.     In November 2014, Plaintiff began handling all investment decisions in regard to the Walkines' Accounts. Beginning at that time and extending through the present, Plaintiff was the primary contact with Victoria Mutual and the Individual Defendants and directed all transactions in regard to the Accounts.

38.     After taking over control of the Accounts from Chung-Walkine, Plaintiff expressed to Defendants a desire to trade in U.S. equities. At that time, Victoria Mutual did not trade in that market, and Plaintiff informed Defendants that he would transfer his Accounts to another brokerage unless Victoria Mutual offered transactions in U.S. equities. Thereafter, Defendants informed Plaintiff that Victoria Mutual had implemented a trading desk capable of processing transactions on U.S. markets, and beginning in November 2015, Plaintiff began trading in U.S. equities.

39.     As discussed herein, unbeknownst to Plaintiff, Victoria Mutual did not have a trading desk capable of processing transactions involving U.S. equities. Instead, without informing Plaintiff or Chung-Walkine, Victoria Mutual opened accounts at Morgan Stanley and Oppenheimer, and proceeded to trade the Walkines' money in accounts that were solely in the name of Victoria Mutual with funds commingled with monies beneficially held for Defendants Rose and Marshall-Miller, among others.  Plaintiff was not made aware of this trading arrangement – or the fact that Victoria Mutual did not have its own U.S. equities trading desk – until four years later, in December 2019.

40.     Throughout the relationship, Defendants woefully mismanaged the Walkines' Accounts, causing them to incur substantial losses, including missing out on investment gains that, in the reasonable exercise of their fiduciary and contractual obligations, Defendants should have secured for Plaintiff.   The Walkines remained unaware of the dereliction of duty on the part of Defendants until a series of failures, as well as the inexplicable refusal to provide account statements, brought to light the dire state of the Accounts and the heavy losses

Plaintiff had suffered. Until that point in time, Victoria Mutual's poor record-keeping, sporadic-at-best statements of account, and intentional concealment of Defendants' operational failures kept Plaintiff in the dark until it was too late. By the time Plaintiff sought to terminate the relationship in 2019, not only had Defendants lost all the money in the Accounts, but they were also claiming that Plaintiff somehow owed Victoria Mutual more $564,000.

41.    On information and belief, no written contract was executed by the parties at the time that the relationship was formed. While a generic "Client Account Opening Agreement" is posted on the Victoria Mutual website, Defendants do not appear to have secured an executed agreement from Plaintiff or Chung-Walkine. Indeed, Plaintiff and his counsel have made repeated requests from Defendants to produce an executed Client Agreement or other contract governing the investment relationship between the Walkines and Victoria Mutual, and Victoria Mutual has explicitly acknowledged, on multiple occasions, that it does not have such an agreement in its possession.

42.    Nonetheless, a valid contractual relationship was clearly created by the intention and the conduct of the Walkines on one hand, by depositing funds for investment with Victoria Mutual, and Victoria Mutual on the other hand, by accepting the Walkines' money and purporting to carry out the Walkines' the investment instructions.

43.    Importantly, the lack of a formal written contract between the parties means that there is no agreement to submit all disputes to an arbitrator, nor is there any agreement regarding the jurisdiction or governing law. Although headquartered in Jamaica, Victoria Mutual has locations in the U.S., including in this District, conducted business with Plaintiff and Chung-Walkine in the U.S., including in this District.

## B.   Defendants Fail to Inform Plaintiff that the Venezuelan Bonds Are in Default

44.     Prior to 2015, the Walkines directed Defendants to purchase bonds issued by PDVSA, a Venezuelan state-owned oil and natural gas company.

45.     In or around April 2015, Plaintiff owned PDVSA bonds with a 7% interest rate which were to mature in 2018.  At that time, Plaintiff inquired about investing in bonds with a higher interest rate, one of 13%. However, Defendants discouraged Plaintiff from doing so. In an email dated April 15, 2015, Defendant Denise Marshall-Miller, Manager of Bond Trading, told Plaintiff: "I don't encourage you to buy that issue rarely trades."  Accordingly, Plaintiff held onto his 7% PDVSA bonds with a maturity date of 2018.

46.     In November 2017, political and economic instability in Venezuela prompted Plaintiff to inquire with Defendants regarding the impact of events in Venezuela on his notes.  In response, Defendant Rose, Assistant Vice President of Sales and Service, and Defendant Marshall-Miller, Manager of Bond Trading, assured Plaintiff that the PDVSA bond was not in default.  Indeed, on November 27, 2017, Defendant Rose advised Plaintiff as follows: "Zac, your Venez 7% 2018, the next coupon date is December 1st. Bond is not in default." (Emphasis added.) Thus, Plaintiff did not need to take any action to protect his investment.

47.     However, unbeknownst to Plaintiff, and as Defendants knew or were obligated to know, PDVSA missed a payment on the bonds on December 1, 2017, and the notes Plaintiff had purchased had been in default since January 1, 2018. Defendant Marshall-Miller belatedly informed Plaintiff of this fact in an email dated November 6, 2018, which stated: "The Bond has been in default since January 1 2018, after missing payment on 1 December 2017."

48.     Upon learning that the PDVSA bond had been in default for nearly a full year, Plaintiff demanded that Defendant's "offload" the bond immediately, which Victoria Mutual was able to do, but at a significantly lower price than could

COMPLAINT
Case No.

1   have been obtained eleven months earlier, in December 2017, when Defendants
2   became aware of the missed payment. Consequently, Plaintiff suffered significant
3   avoidable losses in this investment.

4        49.    Plaintiff reasonably relied on the advice Victoria Mutual provided in
5   November 2017 – namely, to continue to hold on to the PDVSA bonds, and
6   suffered losses accordingly.  Critically, the information requested by Plaintiff and
7   furnished by Victoria Mutual was not publicly available. Hence, Plaintiff
8   reasonably relied on the knowledge and expertise of Defendants Rose and
9   Marshall-Miller, both of whom represented to Plaintiff that the PDVSA bonds
10  were not in default and therefore had a duty to inform Plaintiff that the information
11  previously provided on November 27, 2017 was no longer accurate as of
12  December 1, 2017.

13      **C.**    **<u>Defendants Fail to Execute the Purchase of Tilray, Inc. Shares</u>**

14       50.    In September 2018, Plaintiff sought to invest in Tilray, a cannabis
15  research, cultivation, and distribution company. However, through Defendants'
16  failure to timely process and execute a properly logged transaction, Plaintiff was
17  deprived of a significant investment opportunity in Tilray, losing out on sizable
18  investment gains.

19       51.    On September 12, 2018, Plaintiff validly instructed Kerice Gray
20  ("Gray"), a Senior Trader with Victoria Mutual, to purchase $50,000 worth of
21  Tilray common stock at the then-current market price.  Specifically, at 12:08 pm,
22  during market hours, Plaintiff instructed Gray via email on that date: "Wanted to
23  pick up 50k worth of Tilray @market.  Please take funds from repo.  That's tilray
24  inc."

25       52.    After Victoria Mutual failed to respond or acknowledge his purchase
26  order for nearly twenty-four hours, Plaintiff again contacted Gray via email on the
27  morning of September 13, 2018, asking "Were you able to get Tilray yesterday?"

28

53.    Minutes later, Gray replied – inaccurately – that "the market would have closed yesterday when you sent this email.   Shall I put in this order now at market?"

54.    Plaintiff then responded that, "THIS ORDER WAS SUBMITTED BEFORE CLOSE!!! DO NOT put the order in[….]   This was a huge missed opportunity and cost me money." (Emphasis added.)

55.    Later that day, Plaintiff was contacted by Defendant Marshall-Miller, to whom Plaintiff pointed out that Defendants "have a history of this," and finally on September 20, 2018, Gray emailed Plaintiff and apprised him that this error had occurred for no legitimate reason.  Gray wrote: "Let me begin by extending my most sincere apologies.  I had a lengthy discussion with Denise [Marshall-Miller] yesterday about what really transpired with me missing your transaction.   In retrospect, I was away from my office when you sent the email and what I should have said when you enquired about the status of the transaction was that I saw your email offer after the market closed, not that you sent it at time.  I absolutely understand your sentiment of disappointment because I dropped the ball on you transaction.  Again, I'm really sorry this happened." (Emphasis added.)

56.    Defendants' failure to properly execute this transaction cost Plaintiff significant investment gains. Tilray shares closed at $104.95 on September 12, 2018, the date Plaintiff placed the buy order, and indeed traded as low as $97.61 on that date.  The share price immediately shot up, trading as high as $300.00 just days later on September 19, 2018.  Defendants' failure to carry out their basic obligation as wealth managers and investment professions to process a simple transaction, in breach of their fiduciary duties and the implied contract between the parties, resulted in substantial losses in recoverable investment gains to Plaintiff.

### D.   Defendants Executed Unauthorized
###      Trades in Energy Trading Partners

57.    In May 2019, Victoria Mutual executed unauthorized trades in Energy Trading in the Walkines' Accounts which resulted in Plaintiff suffering significant losses.

58.    On May 10, 2019, Plaintiff instructed Victoria Mutual to sell the Walkines' interest in Buckeye Partners L.P ("Buckeye") and use the proceeds of that liquidation to purchase shares in Energy Trading. Specifically, Plaintiff instructed Defendants to "sell ALL of my holdings in BPL (Buckeye) and use the proceeds to buy ET at market.  DO NOT use proceeds of sale for anything else as the discussion of my account settlement has not concluded."

59.    Thereafter, Victoria Mutual liquidated Plaintiff's holdings in Buckeye, and used the proceeds of approximately $337,505 to purchase approximately 26,300 shares in Energy Trading.

60.    Subsequent to those transactions, Victoria Mutual, unilaterally and without Plaintiff's or Chung-Walkine's authorization, sold approximately 150 shares of Energy Trading in the Accounts. The deal tickets from those transactions include a handwritten note from Gray, the Victoria Mutual Senior Trader responsible for conducting these transactions, indicating as follows: "Zac Walkine sells. Fees – None.  House purchase 2053813. Client sale 2053801." Significantly, although Gray documented the sale of Buckeye and the purchase of Energy Trading, the deal tickets contain no mention of the unauthorized sale of the 150 shares of Energy Trading.

61.     This sale, made contrary to the Plaintiff's instructions, was executed without any justification and resulted in the Walkines suffering a loss of investment gains, dividends, as well as cash generated by the sale of the Energy Trading shares.

62.    In April 2020, the Walkines authorized the liquidation of their entire position in Energy Trading, among other securities, in order to avoid losses

associated with the steep market downturn resulting from Covid-19. Plaintiff properly place an order to sell his investment in Energy Trading to stem further losses. Defendants failed to execute the sale as ordered: they sold a portion of the Energy Trading investment, but they did not liquidate Plaintiff's position as instructed. Moreover, they tried to conceal their costly mistake by providing Plaintiff with a purported confirmation that was not only prepared by Interactive Brokers, a securities broker that was not involved in this transaction in any way, shape, or form, but that "confirmation" documented a purchase of shares, not a sale.

63.    Importantly, the correspondence between Plaintiff and Victoria Mutual during the period of May 2019 through April 2020, Plaintiff repeatedly attempted to obtain documentation regarding his Accounts, and such requests were consistently ignored.

**E.    Victoria Mutual's Woefully Inadequate, and Often Non-Existent, Record-Keeping and Account Statements**

64.    As the correspondence and documentary record between the parties overwhelmingly demonstrates, Victoria Mutual repeatedly failed to provide Plaintiff with statements of account – much less accurate statements – relating to the monies it beneficially held for Plaintiff.   Indeed, Victoria Mutual's own documents, produced to Plaintiff in response to Plaintiff's counsel's demand upon Victoria Mutual, reveal that, in breach of their fiduciary duties, Defendants sent the Walkines virtually no statements between 2015 and 2020.

65.    The purported statements that do exist could best be described as haphazard, but in fact they illustrate a reckless disregard for Victoria Mutual's record-keeping obligations.   In the rare instances when Defendants transmitted a "statement," what Plaintiff was typically a spreadsheet without Plaintiff's name, account number, address, or any other identifying information.

66.    For instance, one "Account Statement" claims to provide information pertinent to Plaintiff's Accounts for the full-year period spanning June 1, 2017

through May 31, 2018.  Another such "Account Statement" curiously purports to cover the eight-and-a-half-month period of June 1, 2018 through February 21, 2019. On their face, these purported statements violate any standard applicable to any financial institution, investment adviser, or broker-dealer with respect to the keeping of client records.  Worse, such statements were never provided to Plaintiff in the ordinary course of business; rather, he received them several months after the relevant time period had closed, and even then, only after making repeated requests upon Victoria Mutual.

67.    Defendants' record-keeping failures and intentional obfuscation were even more damaging because Victoria Mutual did not offer online access to client account information.  Because Victoria Mutual lacked a portal or online access, Defendants could continue to conceal its failures because they knew Plaintiff had no way of independently discovering them.

68.    Other examples of poor record-keeping on the part of Victoria Mutual include, without limitation:

- In August 2019, Plaintiff made a number of inquiries about checks deposited by him into the Accounts but which were not reflected in the two statements provided to him;

- Plaintiff received a statement from Victoria Mutual purporting to cover the period of June 1, 2017 through May 31, 2019;

- After repeatedly requests, Plaintiff received an inaccurate statement on January 28, 2019, and, after informing Victoria Mutual of the inaccuracies, subsequently received an amended statement on February 15, 2019.  In an email dated April 5, 2019, Victoria Mutual apologized for sending an inaccurate statement;

- On May 13, 2020, Plaintiff received an email from Defendant Burchenson, CEO of VM Wealth, purporting to attach two "statements." These so-called "statements" were anything but:

they were spreadsheets that did not contain Plaintiff's name, account number, or any identifying information whatsoever.

69.    Victoria Mutual's chaotic record-keeping also resulted in its repeated failure to properly account for significant sums deposited by the Walkines into the Accounts, an egregious error compounded by the lack of periodic statements. After learning of any misplaced funds, Plaintiff alerted Victoria Mutual, including, for instance, in an email sent on September 18, 2019, Plaintiff raised concerns about five checks deposited into the Walkines' Accounts.

70.    By way of example, on December 14, 2017, the Walkines deposited a check in the amount of $203,000, and on April 27, 2018, they deposited a check in the amount of $300,000, both deposits made by Plaintiff at the Victoria Mutual Bank, Ocho Rios, Jamaica. Although the correspondence shows that Defendants acknowledged receipt of these deposits totaling $503,000, the Accounts never reflected the funds.

71.    Troublingly, an email dated September 9, 2019 acknowledges that Victoria Mutual was "not able to locate" part or all of the funds. Subsequent correspondence continuing through April 2020 reveals that Victoria Mutual at turns "located" part or all of the missing $503,000, but the Walkines' account balance never reflected the full deposit.

72.    In February 2020, Victoria Mutual conveyed to Plaintiff by email that it was "able to confirm receipt of the 300k highlighted," but Defendants completely lost track of the other deposit, the one in the amount of $203,000:  "As I shared with Dr Fung-Chung this morning, please ascertain from your bank if the cheque for 203k + was negotiated as our records are not showing a deposit to our bank account."

73.    During the same time period that Victoria Mutual lost or otherwise mishandled the deposits $503,000, Victoria Mutual also failed to fully account for a deposit of $152,691.75, deposited into the Walkines' Account on July 13, 2018.

After that deposit was made, only $132,691.75 was reflected in the Accounts. Repeated requests by Plaintiff for information on these deposits were either not addressed or not sufficiently addressed, and these amounts remain missing.

74.    The Walkines have not recovered the missing funds that they lost as a direct result of Victoria Mutual's mismanagement of monies deposited by the Walkines.

### F. Defendants Commingled Plaintiff's Accounts with Morgan Stanley and Oppenheimer Accounts

75.    For years, neither Plaintiff nor Chung-Walkine was aware of the state of their investments because Defendants so rarely provided Plaintiff with statements, much less accurate statements.  In other words, for most of the relationship, Plaintiff did not know – and could not have known – how badly Victoria Mutual had mismanaged the Walkines' funds.

76.    In September 2018, after Victoria Mutual failed to execute Plaintiff's purchase order for Tilray shares, Plaintiff became concerned about how the Accounts were being managed on a broader scale. He requested up-to-date statements showing all positions and balances for the Accounts. Tellingly, this request went unanswered for months, even as Plaintiff renewed his demand on numerous occasions.

77.    It was not until March 2019 that Victoria Mutual provided the requested information. The purported "statement" that Victoria Mutual furnished revealed that not only had Defendants lost all of the Walkines' money, but somehow Plaintiff owed Victoria Mutual $564,477, which was impossible since the Accounts did not trade on margin and Plaintiff could not have authorized trades for which the Accounts did not have the necessary funds.  According to Defendants, Victoria Mutual had extended those funds on Plaintiff's behalf to cover positions after their values had dropped. After Plaintiff disputed this absurd debt, Victoria Mutual promised to conduct an investigation into the status of the Accounts.

78.     Defendants failed to reconcile the discrepancies and provide Plaintiff with any statements of Account – much less accurate ones – and instead restricted Plaintiff's access to Victoria Mutual services. Defendants limited trades, transfers, dividend payments, and withdrawals while they claimed to conduct their investigation into Plaintiff's purported debt.

79.     Nine months later, Plaintiff received yet another surprise.   In December 2019, in response to his demand that Victoria Mutual provide him with trade confirmations regarding certain transactions, Plaintiff received documentation showing that his trades in U.S. equities were being carried out not by Victoria Mutual, but by Morgan Stanley and Oppenheimer. Plaintiff learned at that time that Victoria Mutual opened accounts at those financial institutions in the names of Defendants Conroy Rose, CEO of VM Pensions Management and Assistant Vice President of Sales and Service, and Denise Marshall-Miller, a VM Wealth trader, and appear to have commingled his Accounts with those Defendants' monies. None of this had been disclosed to Plaintiff at any time prior to that time. Instead, Defendants had passed off the trading desks and trading capabilities of those financial institutions – specifically with respect to U.S. equities – as their own.

80.     In March 2020, Plaintiff attempted to cash out his Accounts, but Victoria Mutual continued to insist that Plaintiff owed $564,000, even though, according to Defendant Marshall-Miller, Victoria Mutual had not completed its investigation of the handling of the Walkines' Accounts.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty
### (Against All Defendants)

81.     Plaintiff repeats and incorporates the allegations above as if fully set forth herein.

82.     Defendants acknowledged that they were fiduciaries to Plaintiff and Chung-Walkine and at all times behaved accordingly as investment adviser and wealth manager to Plaintiff. As a provider of financial advice and investment advisory services, Defendants were fiduciaries as to Plaintiff and owed him the highest duties of loyalty, candor, due care and prudence in providing financial services and acting as an investment adviser on his behalf. As a fiduciary, Defendants have a continuing duty to act exclusively for the benefit of Plaintiff in the discharge of their investment management and advisory services.

83.     Defendants further owed Plaintiff the fiduciary duty to act in good faith.

84.     Plaintiff was fully dependent upon the Defendants' ability, skill, knowledge and goodwill for their decision to engage Defendants for wealth management and investment advisory services.

85.     Defendants breached their fiduciary duties by the conduct alleged herein, including without limitation, misplacing deposits, failing to execute trades that were validly ordered, conducting unauthorized trades, uniformly failing to provide statements, communicating inaccurate information, and failing to communicate material investment information reasonably impacting the Walkines' investment decisions, all to the economic detriment of Plaintiff.

86.     As a direct and proximate consequence of the Defendants' conduct as alleged herein, Plaintiff suffered significant losses and has suffered damages in an amount to be determined at trial, and also seek disgorgement of any undue and unjust gains of Defendants, as well as all other equitable relief deemed just and proper.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty
### (Against All Defendants)

87.     Plaintiff repeats and incorporates the allegations above as if fully set forth herein.

88.     As alleged herein, the Defendants breached their fiduciary duties to Plaintiff.

89.     Each Defendant aided and abetted each other Defendant in breaching their fiduciary duties to Plaintiff by knowingly inducing and participating in a substantial way in the breaches of fiduciary duty, as alleged herein.

90.     As a direct result of each Defendant aiding and abetting the other Defendants' breaches of fiduciary duty, Plaintiff suffered damages in an amount to be determined at trial, and also seek disgorgement of any undue and unjust gains of Defendants, as well as all other equitable relief deemed just and proper.

## THIRD CAUSE OF ACTION

### Breach of Implied Contract
### (Against All Defendants)

91.     Plaintiffs reallege all of the preceding paragraphs as if fully set forth herein.

92.     At all times, the parties intended for there to be a contractual relationship between and among them for the provision of wealth management and investment advisory services, and at all times, the parties behaved as though such a contract was in effect.

93.     Defendants breached the implied contract between the parties by the conduct alleged herein, including without limitation, misplacing deposits, failing to execute trades that were validly ordered, conducting unauthorized trades, uniformly failing to provide statements, and failing to communicate material

COMPLAINT
Case No.

investment information reasonably impacting the Walkines' investment decisions, all to the economic detriment of Plaintiff.

94.   In addition, Defendants breached the duty of good faith and fair dealing implied in a contract under California law by exercising their discretion in bad faith and deliberately engaging in conduct that resulted in Plaintiff's losses.

95.   As a direct result of Defendants' breaches of contract, Plaintiff has suffered damages and other losses in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Breach of Contract
### (Against All Defendants)

96.   Plaintiff repeats and realleges all of the preceding paragraphs as if fully set forth herein.

97.   This cause of action is pled alternatively to the Third Cause of Action.

98.   Plaintiff and Defendants entered into a written contract whereby Defendants agreed to provide wealth management and investment advisory services to Plaintiff.

99.   Plaintiffs have performed all of the terms and conditions required of it under this agreement.

100.   Defendants have breached its agreement to provide the contracted for investment services by the conduct alleged herein, including without limitation, misplacing deposits, failing to execute trades that were validly ordered, conducting unauthorized trades, uniformly failing to provide statements, and failing to communicate material investment information reasonably impacting the Walkines' investment decisions, all to the economic detriment of Plaintiff.

101.   Defendants' breaches of the contract between the parties have resulted in Plaintiff suffering damages to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.   For actual damages;

B.   For an Order granting restitution, disgorgement of ill-gotten gains and profits, and such other equitable relief as the Court deems just and proper;

C.   For reasonable attorneys' fees, costs and expenses of investigation and litigation, including experts' fees and costs;

D.   For costs of suit, pre-judgment, and post-judgment interest;

E.   For punitive damages; and

F.   For such other and further relief as the Court may deem necessary or appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury.


DATED: September 12, 2022          Respectfully submitted,

**BERGER MONTAGUE PC**

/s/ *Sophia M. Rios*
Sophia M. Rios (Bar No. 305801)
401 B Street, Suite 2000
San Diego, CA 92101
Tel: (619) 489-0300
srios@bm.net

Michael Dell'Angelo*
Barbara A. Podell*
Andrew Abramowitz*
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel:   (215) 875-3000
Email: mdellangelo@bm.net
          bpodell@bm.net
          aabramowitz@bm.net
*Pro hac vice to be requested*

*Counsel for Plaintiff Zachary Walkine*

COMPLAINT
Case No.